COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, Clements and Senior Judge Bray


BONITA HANSBERRY

                                         MEMORANDUM OPINION[*]
v.    Record Nos. 0117-03-2 through          PER CURIAM
                0120-03-2                   JUNE 17, 2003

CHARLOTTESVILLE DEPARTMENT
 OF SOCIAL SERVICES


         FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
               Joseph F. Spinella, Judge Designate

         (Richard A. Davis, on brief), for appellant.

         (Allyson Manson-Davies, Assistant City
         Attorney, on brief), for appellee.


     In four separately filed and numbered appeals, Bonita

Hansberry (mother) appeals the decision of the circuit court

terminating her parental rights to four of her children:  Dashad

Hansberry (Rec. No. 0117-03-2); Rashad Hansberry (Rec. No.

0118-03-2); China Hansberry (Rec. No. 0119-03-2); and Kierra

Hansberry (Rec. No. 0120-03-2).  She contends the evidence was

insufficient to support the terminations under subsections (B)

or (C) of Code § 16.1-283.  Upon reviewing the record and briefs

of the parties, we conclude that these appeals are without merit.

Accordingly, we summarily affirm the decisions of the trial court.

Rule 5A:27.

----

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

BACKGROUND

On appeal, we view the evidence and all the reasonable inferences therefrom in the light most favorable to appellee as the party prevailing below. McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346 (1990). So viewed, the evidence showed that during a course of time, the Charlottesville Department of Social Services (CDSS) removed four of appellant's children from her home and placed them in foster care.

### The Twins: Rashad and Dashad

On April 21, 2000, three-month-old Rashad was taken to UVA Hospital after a "Child Health Partnership home visitor" observed bruising on Rashad's face. Mother said she was not present during the injury, but she suspected that China, her three-year-old daughter, was in the crib with Rashad and likely caused the injury by jumping on him. A CDSS worker recalled that mother tried to avoid treatment and remove Rashad from the hospital, and she was reluctant to cooperate with hospital staff. Rashad was released from the hospital on April 22, 2000. On May 16, 2000, a pediatric specialist referred Rashad "to an early infant early intervention program, Babies Can't Wait, for developmental delays." Records showed that Rashad will also need "physical, occupational, speech therapy and follow-up care with opthamology due to facial bruising on 4-21-00."

CDSS prepared a foster care service plan for Rashad on June 1, 2000, with a goal of "Return Home" and a target date of

-

November 25, 2000. In order to achieve the goal of having Rashad returned home, mother was required to "create a safe, stable, maximally supervised home for Rashad and his twin brother." She was required under the foster care service plan to "cooperate fully in recommended services," participate in a substance abuse evaluation, "follow-through with individual counseling," "maintain stable employment," "participate in behavorial intervention services" arranged by CDSS for China who may pose a threat to the younger children, comply with "further prevention services offered through Family Preservation Services," "enroll and successfully complete a parenting education class" by September 2000, provide CDSS with written documentation of successful completion and attendance in such a class, maintain contact with the foster care social worker at least once a month to discuss her case and arrange with CDSS in advance a visitation schedule.

On April 24, 2000, CDSS took custody of Dashad, Rashad's twin brother. CDSS alleged that Dashad "is at risk of being abused and neglected by his mother who has previously been adjudicated as having abused and neglected another child in her care." Dashad's June 1, 2000 foster care service plan described a home visit by a CDSS worker at which the worker saw China hit Dashad repeatedly on the head. The worker noted that Kierra, who was four years old at the time, fed Dashad. As with Rashad, CDSS offered services to mother to help improve the safety and

-

supervision of the children in her home, including childcare services and in-home counseling. Dashad's service plan required that he receive "the same services as his brother Rashad and . . . he will also require services through Babies Can't Wait, physical, occupational and speech therapy." Mother was directed to comply with the same requirements as included in Rashad's foster care plan. Dashad was placed with the same foster care family as Rashad.

The record showed that mother had "two other children in foster care" prior to Rashad and Dashad's removal. "Allan, age 8, is currently receiving services from a children's residential facility, and Octavius, age 6, is currently in permanent foster care." At the time of Dashad's removal, mother "refused any further prevention services for Kierra and China against CDSS' strong encouragement for her to do so."

On June 16, 2000, the juvenile court found that Rashad and Dashad were neglected, and it directed CDSS to place them in foster care. On June 28, 2000, the juvenile court found that "[r]easonable efforts have been made" by CDSS "to reunite [each] child with his" parent, and it approved the foster care plans, adding the following conditions: (1) mother will "successfully work with a parenting 'coach' or other similar, one-on-one parenting skills counsel[or];" (2) mother will undergo a psychological evaluation; and (3) mother "will cooperate with CDSS in the provision of reasonable services or programs

-

designed to remedy the conditions that led to foster care" placement.

On November 15, 2000, CDSS prepared foster care service plan reviews for the twins, with a program goal "Return Home" and a target date of June 2001 for goal achievement.

On April 12, 2001, CDSS recommended that the goal of returning the children home be changed to adoption. On June 1, 2001, CDSS filed petitions to terminate mother's residual parental rights to the twins.

On June 29, 2001, the juvenile court terminated mother's residual parental rights based on Code § 16.1-283(B). Mother appealed to circuit court.

### The Girls: China and Kierra

China and Kierra Hansberry were placed in CDSS care on February 28, 2001, pursuant to Child in Need of Services (CHINS) petitions and orders. Their initial April 12, 2001 foster care service plans had a program goal of "Return Home," with a target date of November 2001. The plans noted founded dispositions of inadequate supervision for burns occurring to both girls in 1998. In addition, "[t]here have been three other founded dispositions made to various caretakers involving Ms. Hansberry's children including physical abuse in 1999, inadequate supervision in 1999, and sexual abuse in 1997."

Before her removal, China, then three years old, "exhibited aggressive and out of control behavior," to which mother was

-

unable to set limits or boundaries.  For example, China "will climb on all types of furniture if given the opportunity."  During an early home visit, a CDSS worker recalled how China "climbed on cabinets, the stove and cars in the parking lot."  Test results found China to be "developmentally delayed" with "significant delays in personal/social skills, adaptive skills and motor skills."  "China is quick to hit others when she is frustrated," and she has a tendency to run out of the house by herself without supervision.  The CDSS case worker reported that China "witnessed a knife incident between her mother and biological father."

Kierra received burns in 1998 that resulted in a "founded disposition of inadequate supervision."  At the time of the April 2001 report, Kierra was five years old and attended kindergarten.  Kierra exhibited signs of aggression and lacked self-control.  She was suspended from kindergarten for kicking a guest at the school.  During the school year, she spent weeknights "with different 'friends' in the neighborhood" and "most weekends with her paternal grandmother."  In 1999, Kierra and her brother "witnessed a stabbing murder in her home."

China and Kierra were placed in the same therapeutic foster home.

Updated foster care service plan reviews prepared in October 2001, reported that mother "declined to attend" or

participate in parenting classes and failed to maintain regular contact with CDSS and the social worker from People Places.

In the January 28, 2002 foster care service plan review, CDSS requested a change in goal from return home to adoption.

On April 18, 2002, CDSS petitioned for termination of mother's parental rights. The juvenile court terminated mother's parental rights to China and Kierra on May 14, 2002. Mother appealed to circuit court.

### Trial De Novo

On July 26, 2002, the trial court conducted a trial de novo on the four petitions to terminate mother's parental rights. The parties presented and the trial court admitted numerous documents and reports, including several foster care service plans and service plan reviews for each child, describing mother and the children at various times during CDSS's long-standing relationship with mother. The documents detailed the extensive services offered to mother and her children over a long period of time and the progress made by each party.

Dr. Jeffrey Aaron, a clinical psychologist, testified that he evaluated mother's emotional and cognitive functioning in August 2000. Mother told Dr. Aaron that she did not want to participate, but was doing so only because CDSS made her. From the outset, she "appeared angry and irritable and resistant." Mother "showed . . . a strong tendency to externalize blame and responsibility." Test results showed her to have a "full scale

-

IQ" of 74, "which places her in the borderline range of cognitive functioning."  Persons within that range exhibit "deficits in their ability to engage in a wide range of cognitive tasks, particularly those that require complex or abstract reasoning, inferences about relationships . . . and related tasks."  Although persons functioning within the "borderline range" can "learn new skills and develop new abilities," Dr. Aaron opined that their "core deficits" such as an inability to "apply[] the learning to new situations, wouldn't be expected to change."  Dr. Aaron noted that mother is "likely to be emotionally reactive and hostile and oppositional, particularly when under stress."  This accounts for her having difficulty "trusting people, forming relationships, [and] making use of what other people could offer, in terms of providing assistance to her or her children."  Dr. Aaron opined as follows:

> [Mother's] general pattern of emotional and
> personality functioning, her tendency to
> deny problems and externalize blame, her
> tendency to become hostile and emotionally
> reactive, and the cognitive deficits that
> I've described, all of these things
> together, in my opinion, make it unlikely
> that she would be able to adequately
> identify and respond to her children's needs
> and meet them.

Based on his assessment, Dr. Aaron felt there was "a poor likelihood" that mother could or would effect a "positive change."  Dr. Aaron believed mother might suffer from "chronic

-

low grade depression" or "posttraumatic stress disorder."
However, due to her proclivity for under-reporting and denying
symptoms, he was unable to make any such diagnoses.

Carrie Lovette was qualified as an expert in clinical
social work.  In November 2000, CDSS referred mother to Lovette
for weekly sessions to help her "learn parenting skills and to
help her learn how to provide a safe environment for her
children."  Mother refused to acknowledge that she had anything
to do with the children's removal or that her parenting skills
were deficient, and she characterized the negative reports as
"lies."  Mother attended thirteen sessions and missed ten and
currently "refuses to return to therapy."  Her last session was
on April 16, 2002.  Despite mother's strong feelings for her
children, Lovette opined that mother lacks "any capacity for
empathy for her children's experience and she, again, doesn't
feel that there were any problems in her parenting behaviors
skills before."  Mother's denials and refusals to accept help
made it impossible for her to make any progress with therapy or
to become a better parent.  Lovette indicated concerns with
mother's "rage and impulse control and honesty."

Robin Warner, a Child Protective Services (CPS) worker, was
appointed to work with mother in April 2000 following Rashad's
removal.  Warner advised the trial court that mother received
CDSS services in 1992 "for a variety of concerns at that time,"
such as mother's volatility and failure to provide appropriate

-

care.  Warner recalled a founded complaint for inadequate supervision in 1998 relating to an incident where Kierra and China received burns from a hot iron.  At the time, mother could not explain how the girls got burned, so CDSS "added more services" and "additional goals" to improve mother's parenting, "her money management, [and] the hygiene of the girls."  In January 1999, CDSS brought in "Children Youth and Family Services" in order to offer "intensive home services in [mother's] home in an effort to improve, really try to improve the environment for the children."  Warner recalled two founded allegations against mother in January and February of 1999.  The February 1999 incident involved the caretaker fleeing the residence and leaving China and Kierra alone after an occupant had been stabbed to death.[1]

   Warner recalled an April 2000 home visit with CDSS worker Susan Brumfield during which China went into the kitchen, climbed the stove and was on the burners, which were turned off at the time.  Mother entered the kitchen, got her down and returned to Warner and Brumfield.  Mother did not warn China of the danger or admonish her not to repeat the conduct.  A short time later, China climbed onto the kitchen sink and turned on

---

[1] Both Lovette and Dr. Aaron recalled mother describing this incident in which mother discovered a murdered victim in the home at which she and the children were living.  Despite mother's denial that the event affected her, Dr. Aaron opined that such an event could have caused or exacerbated "her social withdrawal and strong mistrust of others."

the faucet.  Mother got her down and brought her into the living room, where China proceeded to throw an apple at Brumfield and hit Dashad "on the head a number of times."  Mother "took China's hand" while speaking with the CDSS workers, but she "did not discipline her."  When Warner warned mother about China's aggressiveness towards Dashad, mother sloughed it off as jealousy.  Warner related the many services provided to mother.  A Family Preservation worker regularly visited and worked with mother in the home, a CASA worker was appointed and evaluations were done.  Warner recalled, "We were really trying to try whatever we could to improve the situation, so that the girls could remain in the home and the boys, at some point, could be brought back."  Despite "all of these services that we had put in, Ms. Hansberry continued to be resistant to the services."  Mother either did not allow the family preservation worker into her residence or "she would be hostile" and not interact with the worker.  Moreover, mother "was missing appointments," and she "wasn't making her individual therapy appointments with Ms. Lovette."  Warner warned mother of the importance of cooperating with the service providers and wrote and provided to mother a list of things mother needed to do to keep the girls and get the twins back.  Despite mother's initial agreement to cooperate, "[t]here was no change" in her participation, and concerns about the two girls persisted, and CPS "continued to get reports" regarding "concerns" about the children.

-

Brumfield, a foster care social worker, began working with mother and her children in October 1999, six months before Rashad's removal. At that time, there were already several service providers working with the mother, such as CHIP, CASA, CPS and Family Preservation Services. Brumfield recalled CDSS's "continuing concerns of the children needing to [be] supervised." After China and Kierra were placed in foster care, "People Places" became the therapeutic foster care agency contracted to work with mother and the girls. Counseling also continued, however, mother "refused to be involved in those services." Brumfield related how she and other CPS workers "tried to model appropriate parenting skills during visits with the children, so that [mother] could make use of those skills in the visits with the girls."

Brumfield discussed the various foster care plans she prepared, copies of which the trial court admitted. She explained that CDSS tried "to be very creative" with mother to try to get her to comply with the plans. She would revise the plan and change strategies to accommodate mother. To that end, she enlisted other facilitators to work with mother, such as a child consultant and a family consultant.

Mother visited the boys thirty-three times and missed appointments twenty-one times. At one point, Brumfield had to advise mother to provide advance notice or a doctor's excuse if

-

she was sick so the foster parents would not have to needlessly transport the boys to a designated location.

Mother's "lack of progress with foster care plan[s]," caused CDSS to explore other options. No relatives came forward, so adoption became the only alternative.

The twins, who are now two years old, are "both developmentally delayed" and have "been identified [as requiring] early intervention services [as well as services] through the school system." Brumfield testified that the twins are doing well in foster care, and the foster care family that has had custody since April 2000 is interested in adopting them.

Both girls had behavorial and health problems before foster care placement. They are presently "doing very well" and have "made a lot of progress with their foster family." In addition to attending and benefiting from regular counseling and therapy sessions, "[t]hey've learned the basics of what it's like to have regular meals [and] a regular schedule. They've learned proper nutrition, sleep. Naps. They've both done incredibly well in school, despite where they were when they came into care."

Mother never completed a parenting class, nor did she stay in contact with her case worker and inform her as to employment or comply with the other requirements in the foster care service plans. Mother reported "in late January or February" of 2002 that she was living with her father in Garrett Square, but

-

Brumfield was not allowed access "to make an assessment." Brumfield averred that she revised and adjusted the foster care service plans in hopes of obtaining more participation and cooperation from mother.

Stephanie Bass is a family consultant with the agency "People Places." She was to "communicate and coordinate" the services and needs of all parties involved and monitor their progress. China and Kierra were placed with Bass's agency at the end of February, 2001. Barbara Gross was the initial family consultant, and Jason Holland was the child consultant. Bass replaced Gross in August 2001, however Holland remained involved. Mother was consistent in attending visits, however, mother was unable to safely and properly supervise the girls during visits. Bass and other support staff tried to teach mother how to discipline and provide time outs through modeling, but mother was never able to do so independently. Bass also recalled mother at times making inappropriate comments to the children. Despite CDSS's efforts, mother still cannot "address discipline or safety issues." Bass related that mother has changed her telephone number at least five times, making it difficult to reach her.

Barba Merriwether is the CASA volunteer for the children. She made many visits and observations at mother's home, the foster parents' homes and during visitation between mother and her children and prepared several reports for the juvenile court

-

throughout the proceedings.[2]  Merriwether noted mother's inability to perceive or admit any deficiencies in her parenting skills and documented several instances where mother failed to discipline and control China.

In a May 2001 report, Merriwether opined "that a permanent home is in the best interest for the boys," who are thriving in the foster home.  In her June 22, 2001 report, Merriwether provided the following summary and recommendation regarding the twins:

> In working with Mrs. Hansberry for more than a year, she has not demonstrated that she is capable or willing to maintain a safe and nurturing home for her twin boys.  Ms. Hansberry does not seem to appreciate the necessity that permanent, long term changes must take place.  I do not believe she fully understands and comprehends the responsibility of caring for a child of any age.
>
> It is my opinion that an adoptive home is in the best interests for the boys.

The girls are doing very well in foster care also. Merriwether reported that the foster parents have provided structure and discipline, and both girls showed much progress socially and academically.  They appeared well-behaved and happy.

---

[2] Three reports, dated June 23, 2000, May 7, 2001, and June 22, 2001, related to the twins, Rashad and Dashad.  Two reports dated November 7, 2001 and May 10, 2002, related to the girls, China and Kierra.

Merriwether experienced difficulty contacting mother or visiting with her to discuss the case.  Merriwether reported in May 2002 that mother "is still unemployed."  Merriwether noted that mother still "does not seem to appreciate or understand" what she must do, and she "has exhibited little ability or willingness to improve the situation."  Thus, Merriwether recommended adoption.

In closing argument, the guardian ad litem advised the trial court that she has been guardian for these children for "almost four years."[3]  The guardian felt that mother "has done her best," however, her "hostility to . . . social services" and lack of cooperation prevented her from ameliorating the conditions that led to the removals.  Thus, the guardian "cannot recommend that [the children] be returned to her."

In deciding to terminate mother's parental rights, the trial court made the following findings:

> It's quite clear to the Court that a plan
> was designed for the mother to correct the
> situations.  And she was instructed on the
> plans.  And in following the instructions,
> in a [span] of over a year, probably about
> two years, that she was not able to comply
> with the requirements of the plan.  And, at
> the present time, she has no visible means
> of support, has no job, really has not
> indicated how she would take care of these
> children, four of them, and has offered no
> plan to the Court to show how she could do
> this in the future.  I feel it's in the best

_____

[3] On appeal, the guardian ad litem did not file a brief on behalf of the children in this case.

interests of the children that they not be returned to her.

By order dated December 11, 2002, the trial court terminated mother's residual parental rights.

ANALYSIS

On appeal, we will not disturb a trial court's findings unless they are plainly wrong or without evidentiary support. See Roanoke City Dep't of Soc. Servs. v. Heide, 35 Va. App. 328, 336, 544 S.E.2d 890, 894 (2001).

In closing argument at the July 26, 2002 de novo hearing, mother's attorney stated:  "What needs to be shown here is whether or not [mother] has been able to remedy the conditions which led to these children coming into care in the first place."  Continuing, mother's attorney argued:

> And she submits that either there was
> nothing to remedy in the first place or that
> she has done so, but she's able to take care
> of these kids.

As to the girls, mother's attorney questioned the basis of removal as stated in the petition of

> July of 2000, relating to serious concerns
> about the safety and well-being of Kierra
> and her sister.  That's what led to these
> girls coming into care.
>
> And realistically, I think what –
> [mother] wants all four of the kids back,
> but I think her position is stronger with
> regard to the two girls.  I think she can
> take care of those two girls.  There's a
> question about them being removed in the
> first place.  That is her position.  With
> regard to the twins, the youngest, those are

-

her children.  Again, the removals arose out
of an injury suffered by Rashad.  We can't
dispute that.  It's reflected in the medical
records.  But it's ideology [sic] where it
came from.  It clearly remains unknown.  And
[mother] doesn't believe that it was
occasion to anything [sic] due to her
neglect or lack of care for the children.
Similarly, Dashad, we think in purview [sic]
is just a reaction.  Social services had
previously removed two of her kids already.
And they were primed, locked and ready to go
essentially for just about any reason to
take these children.

On December 11, 2002, the trial court entered final orders

in the four cases heard and argued on July 26, 2002.  Mother's

attorney endorsed each order, "Seen Objected To."

In her opening brief, mother contends the

evidentiary record plainly shows that CDSS
failed to make reasonable and appropriate
efforts to provide medical, mental health or
other rehabilitative services and support to
the end that Ms. Hansberry could make
additional substantial progress towards
eliminating the Conditions.  Such efforts
are a condition precedent to the trial
court's terminating [mother's] residual
parental rights.  [Mother] contends that
[she] remedied substantially the Conditions
and made substantial progress towards
eliminating such Conditions.  However, to
the extent [mother] was unable to make more
substantial progress, [mother] has good
cause due to CDSS's failure to make
reasonable and appropriate efforts to
provide such services.

Mother never argued to the trial court that CDSS failed to

make reasonable or appropriate efforts, nor did she contend

below that there was good cause for her failure to follow

through or respond to CDSS's rehabilitative efforts.

-

"[E]ndorsing a[n order] 'seen and objected to' does not preserve an issue for appeal unless the record further reveals that the issue was properly raised for consideration by the trial court." Konefal v. Konefal, 18 Va. App. 612, 615, 446 S.E.2d 153, 155 (1994). "No ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18.

Because mother filed no post-judgment pleadings raising the good cause defense, we are precluded from addressing that argument on appeal. See Rule 5A:18. Moreover, because the record contains abundant evidence to support the trial court's finding that CDSS made reasonable and appropriate efforts to provide services and because the record fails to contain sufficient, credible evidence establishing good cause for mother's failure to respond or follow through with those services, the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

Therefore, the only issues argued and preserved by mother were those raised in her closing argument, namely, (1) there was insufficient evidence of harm or danger to remove the children in the first place; (2) there was nothing for mother to remedy; and/or (3) mother has remedied any such conditions and can now care for the children. The only issue raised at trial and

-

argued in mother's brief is whether there was sufficient evidence that mother failed to follow through with services and remedy the situation requiring removal.  Thus, we limit our analysis to that issue.

Rashad and Dashad

The trial court terminated mother's parental rights to Rashad and Dashad pursuant to Code § 16.1-283(B), which provides in pertinent part:

> The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> 1.  The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2.  It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time.  In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

Viewed in the light most favorable to CDSS, clear and convincing evidence proved that:  (1) the twins "were found by the court to be neglected or abused" and were placed into foster

-

care pursuant to court commitment, Code § 16.1-283(B); (2) CDSS had, prior to the twins' placement in foster care, made efforts to rehabilitate mother, Code § 16.1-283(B)(2); (3) termination "is in the best interests of the child," Code § 16.1-283(B); (4) the "neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development," Code § 16.1-283(B)(1); and (5) "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the safe return to his parent or parents within a reasonable period of time," Code § 16.1-283(B)(2).  That mother "without good cause, ha[d] not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse of the child," constituted prima facie evidence "of the conditions set forth in subdivision B 2."  Code § 16.1-283(B)(2)(c).  At the time of trial, the twins had been in foster care over two years.  Not only was there a lack of evidence that mother substantially corrected or eliminated the conditions leading to foster care, but CDSS presented evidence that mother refused to acknowledge any deficiencies existed and appeared to thwart CDSS's attempts to provide services to remediate her parenting and supervisory skills.

-

CDSS presented sufficient clear and convincing evidence to support the trial court's findings and rulings.  Moreover, mother did not rebut the prima facie case established by CDSS. Therefore, the evidentiary requirements of Code § 16.1-283(B)(2) had been met, and the trial court's findings and judgment were not plainly wrong or without evidence to support them.

<u>China and Kierra</u>

The trial court terminated mother's parental rights to China and Kierra pursuant to Code § 16.1-283(C), which provides in pertinent part:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
>     *      *      *      *      *      *      *
>
>     2.  The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.  Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan

-

> jointly designed and agreed to by the parent
> or parents and a public or private social,
> medical, mental health or other
> rehabilitative agency shall constitute prima
> facie evidence of this condition.  The court
> shall take into consideration the prior
> efforts of such agencies to rehabilitate the
> parent or parents prior to the placement of
> the child in foster care.

The evidence, viewed in the light most favorable to CDSS, proved by clear and convincing evidence both (1) that CDSS made "reasonable and appropriate efforts" to help mother remedy the conditions "which led to or required continuation of the [China and Kierra's] foster care placement" and (2) that mother, "without good cause" was "unwilling or unable within a reasonable period of time not to exceed twelve months" from the date of placement in foster care failed "to substantially remedy" those conditions.  Code § 16.1-283(C)(2).  In reaching this conclusion, the trial court took "into consideration the prior efforts" of CDSS "to rehabilitate" mother.  Id.

Pursuant to Code § 16.1-283(C)(2), CDSS presented prima facie evidence that mother "without good cause, ha[s] failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of [China and Kierra's] foster care placement in accordance with [he]r obligations under and within the time limits or goals set forth in [the] foster care plan[s] filed with the court."  Id. Moreover, mother did not rebut that prima facie evidence. Therefore, the evidentiary requirements of Code § 16.1-283(C)(2)

-

had been met, and the trial court's findings and judgment were not plainly wrong or without evidence to support them.

Accordingly, the decisions of the trial court are summarily affirmed.

<u>Affirmed.</u>